IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

PETER J. PASKE, JR.,                    §
                                        §
       Plaintiff,                       §
                                        §
v.                                      §
                                        §
JOEL FITZGERALD, individually           §        CIVIL ACTION NO. H-12-2915
and in his capacity as Chief            §
of Police of the City of                §
Missouri City, Texas, and THE           §
CITY OF MISSOURI CITY, TEXAS,           §
                                        §
       Defendants.                      §

MEMORANDUM AND ORDER

Pending is Defendants' Motion for Summary Judgment (Document No. 39), Plaintiff's Motion for Partial Summary Judgment (Document No. 40), Plaintiff's Motion to Strike Assertions in and Attachments to Defendants' Motion for Summary Judgment (Document No. 58), and Defendants' Objections to Inadmissible Evidence Filed by Plaintiff in Opposition to Defendants' Motion for Summary Judgment (Document No. 61).   After carefully considering the motions, responses, replies, and applicable law, the Court concludes as follows.

I.  Background

Plaintiff Peter J. Paske, Jr. ("Plaintiff"), a white man, graduated at the top of his class from a basic peace officer

training course in 1995.[1]  In 1996, Plaintiff was one of two people hired by the Police Department of Defendant City of Missouri City, Texas (the "City") out of a pool of 80 candidates.[2]  Plaintiff was promoted to sergeant and was appointed to run the Criminal Investigations Division ("CID"), where he supervised more than 20 other officers.[3]  Plaintiff engaged in extensive training, earning more than 3,500 hours of continuing education as a police officer.[4]  Plaintiff was respected and liked by many of his colleagues, who describe him as a good officer and supervisor.[5]

In April 2009, the City appointed Defendant Joel Fitzgerald ("Chief Fitzgerald"), a black man, as its Chief of Police.[6]  Chief Fitzgerald had served for almost 18 years in the City of Philadelphia Police Department.[7]  Later that year, when two captain's positions became available, Plaintiff was among 26 candidates who applied for the positions.[8]  The best applicants

---

[1] Document No. 52, ex. I ¶ 2.

[2] Id., ex. A at 255:21-24; id., ex. I ¶ 3.

[3] Id., ex. A at 256:4-9; id., ex. B at 70:2-6.

[4] Id., ex. C at 25 of 42.

[5] See, e.g., id., ex. D at 31:12-25; id., ex. E at 34:10-24; id., ex. G at 18:21-25; id., ex. H ¶¶ 3-4.

[6] Document No. 39, ex. G at 148:6-10.

[7] Id., ex. G at 148:13-18.

[8] See Document No. 10 ¶¶ 20-21; Document No. 39 ¶ 3; Document No. 52 at 6.

were interviewed by an independent panel of police officers from other departments, who provided to Chief Fitzgerald their recommendations in the form of a ranked list.[9] Chief Fitzgerald, who was the ultimate hiring decisionmaker, then interviewed the candidates and created a final ranked promotional list, which was similar to the list he had been given by the panel.[10] Lieutenant Mike Berezin ("Berezin"), an internal candidate who is white, ranked first, and he received the first open captain's position.[11] Plaintiff was ranked fourth, behind Geneane Merritt ("Merritt"), a black candidate, who formerly was a colleague of Chief Fitzgerald in Philadelphia.[12] Merritt received the second captain's position when it opened a few months later.[13] Plaintiff alleges that Chief Fitzgerald did not take his interview with Plaintiff seriously and appeared already to have decided to hire Merritt.[14] Plaintiff testified that he twice asked Chief Fitzgerald to see the test scores, which Chief Fitzgerald refused to permit, and that

---

[9] Document No. 39, ex. H at 53:7-55:9; Document No. 10 ¶ 21.

[10] Document No. 39, ex. H; Document No. 10 ¶ 21.

[11] See Document No. 39, ex. H at 55:2-12, 21-23.

[12] Id., ex. H at 55:2-9; Document No. 52, ex. I ¶ 9.

[13] Document No. 39, ex. H at 55:23-24; Document No. 10 ¶ 23.

[14] Document No. 10 ¶ 22; Document No. 52, ex. I ¶ 10.

Plaintiff's relationship with Chief Fitzgerald thereafter ceased to be friendly.[15]

Plaintiff alleges that Merritt was unqualified for the captain position, that her lack of qualification was apparent from the background investigation conducted in connection with her hiring, and that she quickly displayed a lack of competence in her new role.[16]   Plaintiff further alleges that Merritt engaged in persistent misconduct for which she was not disciplined, including dressing inappropriately, bringing her children to work on a regular basis, and allowing known gang members to stay at her house.[17]   Plaintiff refused to sign one of Merritt's time sheets, and told Assistant Chief Worrell that he did not believe Merritt had worked all of the hours she reported.[18]   Plaintiff believed Merritt to be incompetent and objected to working under her, and therefore requested and received a transfer out of CID back to patrol.[19]

In July 2011, Merritt took funeral leave for a funeral in Philadelphia, and during her leave two officers found her at her

---

[15] Document No. 52, ex. I ¶ 14.

[16] Document No. 10 ¶¶ 24, 27; Document No. 52 at 7-9.

[17] Document No. 52 at 9; id., ex. I ¶¶ 12, 18.

[18] Document No. 52, ex. A at 306:20-307:14.

[19] Id., ex. I ¶ 15.

home in Missouri City.[20]  Chief Fitzgerald reviewed the funeral
leave policy and determined that Merritt had not violated it
because the policy did not require officers to leave town and
attend a funeral in order to take funeral leave.[21]  When Plaintiff
found out about the incident, he complained to Assistant Chief
Keith Jemison ("Jemison"), asserting that Merritt had lied and
should be punished, but Jemison told him it was none of his
business.[22]  Plaintiff was "very upset" with Chief Fitzgerald's
apparent "decision to not discipline Merritt for anything she
did."[23]  Shortly thereafter, Merritt submitted to Chief Fitzgerald
a request for her own demotion to lieutenant, which the Chief was
happy to receive because she had not performed up to standard.[24]

On July 20, 2011, during a monthly supervisors' meeting
conducted by Chief Fitzgerald after an earlier COMPSTAT meeting,
Plaintiff voiced an objection to the Chief's desire for high level
officers to wear white shirts, commenting that in Texas only
firemen, milkmen, and Klansmen wear white.[25]  Later in the meeting,
Plaintiff, who had heard rumors of Merritt's upcoming demotion,

---

[20] *See* id., ex. E at 9:15-13:20.

[21] Document No. 39, ex. H at 92:9-93:7.

[22] Document No. 52, ex. B at 82:18-83:8; id., ex. I ¶ 21.

[23] Id., ex. I ¶ 22.

[24] Document No. 39, ex. H at 101:9-12, 102:13-20.

[25] Document No. 52, ex. I ¶¶ 24-26.

raised his hand and asked Chief Fitzgerald whether Captain Merritt would be demoted, and whether Lieutenant Brandon Harris would be promoted.[26]   The Chief said he wasn't announcing that information at this time, turned red, and asked Plaintiff if he was not "supposed [to have] run the COMPSTAT meeting today?"   Plaintiff said, "No sir."   The Chief said, "Yes you were," and ordered Plaintiff to provide a one page memo about why he had not done so, to which Plaintiff replied, "I will give you two pages."[27]

After the meeting, Plaintiff sent to Chief Fitzgerald an email to "apologize for my lack of respect at the compstat meeting today."[28]   Later that day, Chief Fitzgerald also sent an email titled "COMPSTAT meeting outburst" to all the other officers who had been present at the meeting, asking them to each provide a memo "regarding Pete Paske's questions, demeanor, and statements" at the meeting.[29]   Twelve of the thirteen reports in the record described Plaintiff's conduct as antagonistic, disrespectful, unprofessional, confrontational, defensive, inappropriate, or insubordinate.[30]

Captain Lance Bothell conducted a professional standards investigation into charges against Plaintiff for disobeying a

---

[26] Document No. 39, ex. A ¶¶ 8-9; Document No. 52, ex. I ¶ 27.

[27] Document No. 52, ex. I ¶ 27.

[28] Document No. 39, ex. Q.

[29] Document No. 52-5 at 15 of 21.

[30] *See* Document No. 39, ex. R.

lawful order, discourteous or insulting language, and unbecoming conduct, and the investigation was reviewed by Jemison and Chief Fitzgerald.[31]  Plaintiff was suspended with pay during the investigation.[32] On July 27, 2011, Chief Fitzgerald and his command staff met with Plaintiff and informed him that he was being demoted to officer with a loss of pay.[33] Plaintiff was visibly upset during the meeting.[34]

On August 2, Chief Fitzgerald and his command staff again met with Plaintiff and put him on a Performance Improvement Plan.[35] The Performance Improvement Plan required Plaintiff successfully to complete a fitness for duty evaluation with the Employee Assistance Program ("EAP"), and, *inter alia*, to "follow all lawful orders" and "not display pompous, argumentative, or disrespectful behavior to any citizen, fellow officer, or supervisor."[36] The Plan, which Plaintiff signed, further cautioned Plaintiff that "[f]ailure to adhere to all City of Missouri City or Missouri City Police

---

[31] *See* Document No. 52-5 at 16 of 21 to 19 of 21.

[32] Id.; Document No. 52, ex. I ¶ 29.

[33] Document No. 39, ex. Z at 158:16-159:7, 168:2-19; Document No. 52, ex I ¶ 30.

[34] *See* Document No. 39, ex. Z at 159:9-10 ("He looked like he was seething and about to boil over."); Document No. 52, ex. I ¶ 30 ("I could feel my face turn red.").

[35] Document No. 39, ex. N; Document No. 52, ex. I ¶ 32.

[36] Document No. 39, ex. N.

Department policies and procedures will result in dismissal, by order of the Chief of Police."[37]

On August 4, Paske attended his first EAP appointment in the Texas Medical Center, where he was told he would have to return two more times.[38]  After the meeting, EAP representative Delphi Medina wanted to rule out the possibility of drug use, and contacted Berezin, now Assistant Chief, to suggest that Plaintiff be drug tested.[39]  Berezin immediately reported the conversation to Chief Fitzgerald.[40]

Plaintiff's next EAP appointment was scheduled for the morning of August 17, and Plaintiff had arranged for his mother-in-law to watch his three children and three of their cousins until Plaintiff returned from the appointment.[41]  That morning, Plaintiff's mother-in-law was hit by a car and taken to the hospital.[42]  Paske arranged for temporary care of the children and attended his EAP appointment.[43]  During the session, the EAP provider advised Plaintiff that he would need to submit to a drug test that day and

---

[37] Id.

[38] Document No. 52, ex. I ¶ 34.

[39] Document No. 39, ex. X at 30:21-25; id., ex. Z at 174:16-25, 178:11-13.

[40] Id., ex. Z at 183:7-10.

[41] Id., ex. E at 20:3-22:19; Document No. 52, ex. I ¶ 35.

[42] Document No. 52, ex. I ¶ 35.

[43] Id.; Document No. 39, ex. E at 23:8-23, 25:3-12; id., ex. W.

gave him written instructions to call Assistant Chief Jemison and report to the police department.[44]

Plaintiff called Jemison and explained that because of the situation with his mother-in-law, he could not report to the police station.[45] A few minutes later, after Jemison reported the call to Chief Fitzgerald, Chief Fitzgerald called Plaintiff and ordered him to come into the police station within one hour.[46] Plaintiff insisted that he could not come in and Chief Fitzgerald hung up.[47] Plaintiff admits that Chief Fitzgerald's order to report to the police station was a lawful direct order and that he did not comply with it.[48] That evening, Chief Fitzgerald sent to Plaintiff an email discharging Plaintiff from the police department for violating departmental regulations, specifically disobeying a lawful order, refusing a drug examination, dereliction of duty, and unbecoming conduct.[49]

---

[44] Document No. 39, ex. E at 25:21-24, 26:4-9.

[45] Id., ex. E at 26:8-20.

[46] Id., ex. E at 27:4-21.

[47] Id., ex. E at 27:12-21.

[48] Id., ex. A ¶¶ 27-30; id., ex. D at 382:12-16 ("Q. This is the way it sounds to me. Tell me if I'm correct. You got an order. You thought the order was unreasonable. So you chose not to comply with it. A. Correct."); id., ex. G at 51:12-18.

[49] Document No. 39, ex. M; Document No. 52, ex. I, ¶ 37.

Plaintiff retained counsel and appealed his demotion and termination to City Manager Allen Mueller ("Mueller").[50]   Mueller reviewed the available evidence and wrote a nine-page report to Plaintiff, concluding:

> I do not believe Chief Fitzgerald erred in recommending you be demoted in rank or in recommending your discharge from the City's police department, and I certainly find no reason to believe Chief Fitzgerald's decisions or recommendations were motivated by anything other than appropriate supervisory considerations.  Likewise, I do not believe that restoring you to service in the City's police department, at any rank, would benefit the City's interests.[51]

As required by Texas law, Chief Fitzgerald submitted an F-5 Report regarding Plaintiff's termination to the Texas Commission on Law Enforcement Standards and Education ("TCLEOSE").[52]   The report indicated that Plaintiff had been discharged for "insubordination or untruthfulness," which qualified as "dishonorably discharged."[53] In a two-day evidentiary hearing before a Texas Administrative Law Judge, Plaintiff challenged the report, contending that he should have received an honorable discharge.[54]   On February 6, 2013, the

---

[50] Document No. 39, ex. E at 47:21-24; id., ex. aa at 1 of 25 to 11 of 25.

[51] Document No. 39, ex. I at 8-9.

[52] See id., ex. B at 2.

[53] Id., ex. B at 2-3; Document No. 10 ¶ 75.

[54] Document No. 39, ex. B at 1.

Administrative Law Judge issued a Decision and Order, finding that "the preponderance of the evidence establishes that [Plaintiff] was terminated for insubordination," and that the report properly indicated that he was dishonorably discharged.[55]

Meanwhile, on September 13, 2012, Plaintiff filed this lawsuit, which Defendants removed to this Court.[56]   Plaintiff's First Amended Complaint alleges causes of action for First Amendment violations and race discrimination and retaliation, and seeks a declaratory judgment that Defendants violated their statutory obligations under Texas Government Code § 164.022.[57]

## II. Evidentiary Objections

### A.   Plaintiff's Objections

Plaintiff objects generally to the voluminous record attached to Defendants' Motion for Summary Judgment, arguing in a series of objections that the Court should strike Defendants' Exhibits J, L, P, T, U, V, W, Y, bb, cc, dd, ff, hh, jj, kk, ll, mm, nn, oo, pp, qq, rr, ss, and tt, which Plaintiff claims Defendants never cite in their Motion, along with all uncited portions of Defendants'

---

[55] Id. at 12.

[56] Document No. 1.

[57] Document No. 10 ¶¶ 76-78.

11

Exhibits D, E, F, G, X, Z, ee, and gg, each of which is a lengthy transcript only minimally cited by Defendants.[58]

In reviewing a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). Indeed, it is not good practice and unduly burdens the record for Defendants to include vast numbers of documents and pages of transcripts that Defendants do not rely on or expect the Court to read, but the surplusage does not prejudice Plaintiff nor impede Plaintiff from pointing to evidence that may raise material fact issues, and Plaintiff's objections are therefore OVERRULED.[59]

Separately, Plaintiff states an objection entitled, "The Unsupported Contention About Child Care for His Children," in which Plaintiff does not identify any particular evidence to which he objects or moves to strike.[60]   To the extent an evidentiary objection is intended--as distinguished from argument--the objection is OVERRULED.  Plaintiff's remaining objections are for

---

[58] Document No. 58.  Defendants filed more than 1,400 pages of documents--of which 750 are transcripts of depositions initiated by Plaintiff--in support of their Motion for Summary Judgment.  *See* Document No. 39, exs. A-vv.  Plaintiff filed almost 500 pages of documents in response.  *See* Document No. 52, exs. A-X.

[59] It is well established that "*[t]he party opposing summary judgment* is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." Ragas v. Tennessee Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998) (emphasis added).

[60] *See* Document No. 58 at 2.

the most part argumentative--as to the proper interpretation to be given to the evidence, or that there is no proper purpose for including the materials. Plaintiffs' remaining objections are all OVERRULED.

B.   Defendants' Objections

Defendants object to part or all of several exhibits attached to Plaintiff's Response to Defendants' Motion for Summary Judgment, primarily arguing that they lack foundation.[61]   *See* FED. R. EVID. 602. Defendants' specific objection to the following portion of the deposition testimony of Captain Lance Bothell, found in Plaintiff's Exhibit F, is SUSTAINED to the extent it is offered for anything more than Captain Bothell's personal impression, and otherwise OVERRULED:

> Q:  Did Sergeant Paske's behavior in that supervisors' meeting of July 2011 in any way affect the operations of the department?
>
> * * *
>
> A:  No.  I don't believe so.
>
> Q (By Ms. Harris):  Did it in any way cause any kind of adverse influence on the workplace?
>
> * * *
>
> A:  No.[62]

---

[61] Document No. 61.

[62] Document No. 52, ex. F at 95:7-15.

Defendants' specific objection to Plaintiff's Exhibit H, the Declaration of David Avera, because Avera's identity was not disclosed until three days before the discovery cut-off date is OVERRULED because Defendants have not established when Plaintiff learned of Avera having discoverable information so as to require his disclosure or that Avera's identity was a surprise to Defendants given that Avera is an employee of the City.[63]

Defendants object to more than 50 separate statements in Avera's declaration to which they generally object on the basis of "FED. R. CIV. P. 56(c)(4) and FED. R. EVID. 402; 602; 611(a) (speculative); and 701; 801(c); 802; [and] 805."[64]  Evidentiary objections must be specific.  United States v. Avants, 367 F.3d 433, 445 (5th Cir. 2004); FED. R. EVID. 103(a)(1).  Because Defendants do not specify which of their objections apply to which of the numerous statements they identify, their objections are OVERRULED.  The Court will not, however, consider any plainly inadmissible evidence.  See Tucker v. SAS Inst., Inc., 462 F. Supp. 2d 715, 722 (N.D. Tex. 2006) ("Because the plaintiff's objections in her motion to strike do not meet the specificity requirement of Rule 103(a)(1), the motion is denied.  Even so, the court will not consider any of the defendant's evidence that is plainly inadmissible.").

---

[63] See Document No 61 at 2.

[64] Id. at 2-7.

Defendants object to various portions of Plaintiff's Exhibit I, Plaintiff's Declaration.  Defendants' specific objections are SUSTAINED as to the following statements in Plaintiff's Declaration, as lacking foundation:  "Merritt was not punished for her blatant lie, which has always been a termination offense at the police department."; "This was soon after Merritt had lied about her funeral leave, and I knew the administration was not going to do anything to punish her."; and "Everyone wanted to keep quiet, keep your head down, and not make waves.  The code of silence became, and still is, a way of life during Fitzgerald's term as Chief.  So no one said or did anything about his misconduct or his discriminatory hiring practices."  Defendants' objections to the following statements are SUSTAINED only as to the italicized portions: "I was very upset with Chief's decision not to discipline Merritt for anything she did, *especially when she lied so blatantly about the funeral leave*."; and "I was still in shock that they were placing these unwarranted demands on me, *only to make my life miserable*."

Defendants' specific objections to Plaintiff's Exhibit J, the Declaration of John Bailey, are SUSTAINED as to the following statements, as lacking foundation: "The department became much more a workplace of fear for many."; "several people were hesitant to bring up serious issues with the Chief and rarely voiced any objections to, or even questioned, his decisions.  Many knew it was

useless to do so."; "But still, the members of the department were afraid to complain about her misconduct."; "it had to have been known to the Chief and his immediate staff and, the thinking went, if he wasn't going to do anything about it, it would only make matters worse for whoever even asked him why this behavior was allowed."; "[Merritt] got away with lying about going to a funeral of her grandmother in Philadelphia."; and "He did not develop a fear of the Chief as most people did, or if he did he hid that feeling."  Defendants' specific Rule 602 objections are SUSTAINED as to the following statements in Bailey's Declaration: "I heard that she was not even at work when she was supposed to be."; and "I heard that Capt. Merritt sent an email saying that her grandmother had died and that she was going to attend the funeral.  Apparently she was approved for funeral leave to go to Philadelphia.  But, two officers were sent to her house and discovered that she had not left town after all."  Defendants' remaining objections to Bailey's Declaration are all OVERRULED.

Defendants' objection to Plaintiff's Exhibit T, the "Expert Report of Melvin L. Tucker," is OVERRULED because Plaintiff has subsequently submitted the proper verification.  *See* <u>Straus v. DVC Worldwide, Inc.</u>, 484 F. Supp. 2d 620, 633-34 (S.D. Tex. 2007) (Rosenthal, J.) (expert report properly authenticated by a sworn declaration filed while summary judgment motion was pending).

Those portions of the evidence to which objections are sustained are STRICKEN, and all remaining objections are OVERRULED.

### III.   Motions for Summary Judgment

A.   Legal Standard

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).   Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted.   Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998).   A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice.   Id.   "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."   Id.   "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1).

"The court need consider only the cited materials, but it may consider other materials in the record." Id. 56(c)(3).

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." Id. Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." Anderson, 106 S. Ct. at 2513.

B.   Analysis

1.   First Amendment Retaliation

Plaintiff alleges that "Paske had a right to speak out against misconduct being committed by the higher-ups at the Missouri City Police Department without suffering retaliation, including the loss

18

of a job.  The right is a well-recognized constitutional right and both Fitzgerald and Missouri City are properly charged with this knowledge."[65]   The Court infers that Plaintiff brings his First Amendment Retaliation claim pursuant to 42 U.S.C. § 1983.[66]

To establish a § 1983 claim for retaliation against protected speech, Plaintiff must show: (1) he suffered an adverse employment action; (2) he spoke as a citizen on a matter of public concern; (3) Plaintiff's interest in the speech outweighs the government's interest in efficiency; and (4) the speech precipitated the adverse employment action.  Nixon v. City of Houston, 511 F.3d 494, 497 (5th Cir. 2007).  Once a plaintiff has shown that his protected speech "was a substantial or motivating factor in the defendant's adverse employment decision, a defendant may still avoid liability by showing, by a preponderance of the evidence, that it would have taken the same adverse employment action even in the absence of the protected speech."  Haverda v. Hays Cnty., 723 F.3d 586, 591-92 (5th Cir. 2013) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 97 S. Ct. 568, 576 (1977).

---

[65] Document No. 10 ¶ 76.

[66] See id. ¶ 84 (seeking declaratory judgment that Defendants violated, inter alia, 42 U.S.C. § 1983).  The Civil Rights Act of 1866 creates a private right of action for redressing the violation of federal law by those acting under color of state law.  42 U.S.C. § 1983; Migra v. Warren City Sch. Dist. Bd. of Educ., 104 S. Ct. 892, 896 (1984).   Section 1983 is not itself a source of substantive rights but merely provides a method for vindicating federal rights conferred elsewhere.  Albright v. Oliver, 114 S. Ct. 807, 811 (1994).

It is undisputed that Plaintiff suffered adverse employment actions when he was demoted and then terminated.  Plaintiff alleges that his demotion and termination were in retaliation for his complaints against Captain Merritt and his criticism of Chief Fitzgerald for failing to respond appropriately to Merritt's misconduct.[67]  Plaintiff cites to his own testimony that in conversations with his superiors he spoke out against Merritt's alleged timesheet falsification, dishonesty relating to a funeral leave when her grandmother died, absenteeism, incompetence, and ineptitude at public speaking.[68]

"[B]efore asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking 'as a citizen' or as part of her public job."  Davis v. McKinney, 518 F.3d 304, 312 (5th Cir. 2008) (quoting Mills v. City of Evansville, 452 F.3d 646, 647 (7th Cir. 2006)); see also Garcetti v. Ceballos, 126 S. Ct. 1951, 1960 (2006) ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.").  The focus of this inquiry is not on the content of the speech, but on "the role

---

[67] Document No. 10 ¶ 58 (Chief Fitzgerald "was punishing [Plaintiff] for refusing to keep his mouth shut about Merritt's misconduct and Fitzgerald's failure to take action on it.").

[68] Document No. 52, ex. B at 80:8-24.

the speaker occupied when he said it." <u>Williams v. Dallas Indep.</u> <u>Sch. Dist.</u>, 480 F.3d 689, 692 (5th Cir. 2007). "Even if the speech is of great social importance, it is not protected by the First Amendment so long as it was made pursuant to the worker's official duties." <u>Id.</u> (citing <u>Garcetti</u>, 126 S. Ct. at 1960). The inquiry into the protected status of speech is one of law, not fact. <u>Connick v. Myers</u>, 103 S. Ct. 1684, 1690 n.7 (1983).

A public employee's speech pursuant to his official duties is not limited to speech that is required by his job; "[a]ctivities undertaken in the course of performing one's job are activities pursuant to official duties" and are therefore unprotected by the First Amendment. <u>Williams</u>, 480 F.3d at 693 (memorandum from high school coach to office manager and principal complaining about funding problems not protected speech); <i>see also</i> <u>Nixon</u>, 511 F.3d at 498-99 (unauthorized press statements by police officer in uniform not protected speech) ("The fact that Nixon's statement was unauthorized by HPD and that speaking to the press was not part of his regular job duties is not dispositive-Nixon's statement was made while he was performing his job, and the fact that Nixon performed his job incorrectly, in an unauthorized manner, or in contravention of the wishes of his superiors does not convert his statement at the accident scene into protected citizen speech.").

The complaints and criticisms for which Plaintiff contends Chief Fitzgerald retaliated against him in violation of his First

Amendment rights were made to Plaintiff's superiors and other police officers. Plaintiff aimed his criticisms at Merritt, the officer who received the captaincy to which Plaintiff had aspired and under whose command he chafed to the point of requesting a reassignment to patrol officer, and at Chief Fitzgerald, who selected Merritt rather than Plaintiff for the captaincy and who Plaintiff believed improperly tolerated Merritt's ineffectiveness and failed to discipline her for various misconduct he believed she had committed. Thus, Plaintiff variously asked the Chief on two occasions to disclose the test scores of the applicants for the captaincy that Plaintiff had not received, complained to Assistant Chief Worrell and to Assistant Chief Jemison about Merritt's failures and misconduct, expressed his disagreement with the Chief's white shirts policy preference in a meeting of supervisors, and in that same setting confronted the Chief by asking if Captain Merritt would be demoted and Lieutenant Harris would be promoted. This was the same meeting in which the Chief ordered Plaintiff to write a one-page memo explaining why Plaintiff had not run the COMPSTAT meeting, to which Plaintiff disrespectfully retorted, "I will give you two pages." The universe of Plaintiff's "speech" was confined to his on-duty statements made to superior officers within the department itself regarding the department's inner workings and urging Plaintiff's direct and implied complaints and criticisms about Merritt and Chief Fitzgerald. Plaintiff himself made no

pretense that he was speaking in the role of a citizen upon matters of public concern but rather claimed as an officer that it was his "business" to raise critical questions up the chain of command about Merritt and the Chief.[69]

---

[69] On Merritt's funeral-leave conduct and the Chief's response, for example, Plaintiff testified as follows:

> Q.   (By Mr. Giles)  All right.  So anyway so you learned that Lieutenant Merritt potentially violated the funeral-leave policy, but you learned of it after she--after the Police Department sent officers to her house to investigate that; is that correct?
>
> A.   Yes.
>
> Q.   So you didn't report the incident which caused someone to investigate it, did you?
>
> A.   I did not call it in.
>
> Q.   Okay.  Now, when you learned of the event after it occurred, you spoke to Chief Jemison about it; is that correct?
>
> A.   I spoke to--yes.
>
> Q.   Okay.  And what did you say to Chief Jemison?
>
> A.   I said, you know, it's a violation, she lied and, you know, what's going to be done in regards to her lying about where she was at that evening and--
>
> * * *
>
> Q.   And what did Chief Jemison say to you when you approached him regarding that issue?
>
> A.   "Leave it alone; it's none of your business."
>
> Q.   And, in fact, it was none of your business, was it?
>
> A.   *I'm a Sergeant at the police department.  It's partially--she--it's part of my business.*

23

The Supreme Court held in <u>Connick v. Myers</u>, 103 S. Ct. 1684, 1690 (1983), that

> when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

To assume that Plaintiff's various complaints about Merritt and Chief Fitzgerald were matters of public concern, just as in <u>Connick</u>,

> would mean that virtually every remark--and certainly every criticism directed at a public official--would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

<u>Id.</u> at 1691. Viewing the summary judgment record as a whole in a light most favorable to Plaintiff, the content, form, and context

---

* * *

> Q.   And so how was it your business as Captain Merritt's subordinate regarding how the command staff supervised Captain Merritt?
>
> A.   *Well, just my--the division I worked for and the people I worked for that I supervised, it made it my business to--I felt that personally it was my business.*

Document No. 52, Ex. B at 82:9-84:2 (emphasis added).

of Plaintiff's various statements of complaint did not constitute speech as a citizen on matters of public concern protected by the First Amendment.  To the extent that any particular complaint made by Plaintiff is arguably protected, Plaintiff has nothing more than a "limited First Amendment interest [that] does not require that [Chief Fitzgerald] tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships."  Id. at 1694.  Defendants' demotion of Plaintiff, and later his discharge, did not offend the First Amendment.[70]

---

[70] Plaintiff also pled Title VII retaliation in his Complaint, but has not urged it in responding to Defendants' Motion for Summary Judgment, except possibly for one sentence that may obliquely refer to it: "Paske decided it was time for someone to protest Fitzgerald's failure to do his job and apply the rules equally, without regard to race."  Document No. 52 at 10.  The testimony Plaintiff relies upon for this assertion pertains only to Plaintiff's complaints about Merritt's behavior, with no mention of race or of Chief Fitzgerald.  Plaintiff has not pointed to any evidence that during his employment as a police officer he ever spoke out or complained about racism or participated in any other activity protected by Title VII.  The City is therefore entitled to summary judgment on Plaintiff's Title VII retaliation claim.  The Fifth Circuit "ha[s] consistently held that a vague complaint, without any reference to an unlawful employment practice under Title VII, does not constitute protected activity."  Davis v. Dallas Indep. Sch. Dist., 448 F. App'x 485, 493 (5th Cir. 2011) (collecting cases); see also Tratree v. BP N. Am. Pipelines, Inc., 277 F. App'x 390, 395 (5th Cir. 2008) ("Complaining about unfair treatment without specifying why the treatment is unfair . . . is not a protected activity.") (citing Harris-Childs v. Medco Health Solutions, 169 F. App'x 913 (5th Cir. 2006)).

2.    Race Discrimination

Plaintiff alleges that the City's conduct "also violates state and federal laws that prohibit discrimination against individuals because of their race and prohibits retaliation for speaking out against racism," and that he fulfilled all legal prerequisites to filing this lawsuit, by having "timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission and the Texas Workforce Commission."[71]   Plaintiff's claims under the Texas Commission on Human Rights Act and counterpart federal Title VII claims will be considered together under a Title VII analysis.

Title VII proscribes an employer from refusing to hire, discharging, or otherwise discriminating against any individual "with respect to his compensation, terms, conditions, or privileges of employment" because of that individual's race.   42 U.S.C. § 2000e-2(a)(1).   The Title VII inquiry is "whether the defendant intentionally discriminated against the plaintiff."   Roberson v. Alltel Info. Servs., 373 F.3d 647, 651 (5th Cir. 2004). Intentional discrimination can be established through either direct or circumstantial evidence.   Wallace v. Methodist Hosp. Sys., 271 F.3d 212, 219 (5th Cir. 2001).   Because Plaintiff presents no direct evidence of discrimination,[72] his claim must be analyzed

---

[71] Document No. 10 ¶ 77.

[72] See Document No. 39, ex. E at 91:24-92:2, 92:7-17 (Plaintiff is unaware of any information showing that Chief Fitzgerald

using the framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 93 S. Ct. 1817 (1973). <u>Wallace</u>, 271 F.3d at 219. Under this framework, a plaintiff must first establish a *prima facie* case of discrimination. <u>Id.</u>

Once the plaintiff establishes a *prima facie* case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. <u>Id.</u> If the employer sustains its burden, the *prima facie* case is dissolved, and the burden shifts back to the plaintiff to establish either: (1) that the employer's proffered reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) the employer's reason, while true, is not the only reason for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-motive alternative). <u>Id.</u>; <u>Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.</u>, 482 F.3d 408, 411-12 (5th Cir. 2007). Where, as here, the Plaintiff alleges pretext, he "must put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates." <u>Wallace</u>, 271 F.3d at 220.

"To establish a *prima facie* case of racial discrimination in employment, an employee must demonstrate that (1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he was the subject of an adverse employment action, and (4) he

---

disciplined him because of his race or has made any statements indicating racial bias).

was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances." Lee v. Kansas City S. Ry. Co., 574 F.3d 253, 259 (5th Cir. 2009).

Defendants do not dispute that Plaintiff can establish the first three prongs of the *prima facie* case.[73] Plaintiff is a member of a protected class because he is white, nobody challenges that he was qualified for his job, and he was indisputably the subject of adverse employment actions when he was demoted and then fired. Defendants argue, however, that "Paske has not, and cannot, show he was treated less favorably than other similarly situated police officers who were not white."[74]

The "nearly identical" standard required to show that a comparator employee is similarly situated is stringent, and excludes employees with "different responsibilities, different supervisors, different capabilities, different work rule violations or different disciplinary records." Beltran v. Univ. of Tex. Health Sci. Ctr. at Houston, 837 F. Supp. 2d 635, 642 (S.D. Tex. 2011) (Miller, J.) (citing Lee, 574 F.3d at 259-60). Although Lee emphasized that "nearly identical" does not mean "identical," it requires a great deal of similarity:

---

[73] *See* Document No. 39 at 10-11.

[74] Document No. 39 at 10.

> The employment actions being compared will be deemed to
> have been taken under nearly identical circumstances when
> the employees being compared held the same job or
> responsibilities, shared the same supervisor or had
> their employment status determined by the same person,
> and have essentially comparable violation histories.
> And, critically, the plaintiff's conduct that drew the
> adverse employment decision must have been 'nearly
> identical' to that of the proffered comparator who
> allegedly drew dissimilar employment decisions.

Lee, 574 F.3d at 260 (citations omitted).

Plaintiff argues that Merritt was a similarly situated black officer who committed the same violations and was not punished.[75] Even assuming, *arguendo*, that Merritt's rank as a captain and later a lieutenant did not preclude a finding that she was similarly situated to Plaintiff, neither her conduct nor her violation history was nearly identical to Plaintiff's. *See* Okoye v. Univ. of Texas Houston Health Sci. Ctr., 245 F.3d 507 (5th Cir. 2001) (plaintiff could not compare herself to three co-workers who were not fired despite committing violations because, unlike plaintiff, the co-workers were not accused of assault); *cf.* Lee, 574 F.3d at 262 (employees were similarly situated when they held identical positions and compiled a similar number of moving violations, including an identical infraction for which one was fired and the other granted leniency).

---

[75] Document No. 52 at 16.

Plaintiff was demoted from sergeant to officer after his confrontational and disrespectful conduct directed at the Chief of Police in a supervisors' meeting, which even Plaintiff characterized as a "lack of respect" for the Chief.[76] Plaintiff has not pointed to any evidence that Merritt or any other officer was disrespectful to a superior officer, or to the Chief himself, and concomitantly he has not shown that any other officer did so under nearly identical circumstances and was not disciplined.

Plaintiff was terminated after he disobeyed a direct lawful order given by the Chief of Police to report to the police station for drug testing. Plaintiff has not produced, and admits he cannot produce, any evidence that any other officer ever chose not to comply with an order from a supervising officer that he considered unreasonable and escaped discipline, or that Merritt ever told the Chief of Police that she would not comply with a direct order that the Chief gave to her.[77] Furthermore, it was only two weeks before Plaintiff disobeyed Chief Fitzgerald's direct order to report to the police station, that Plaintiff had signed a Performance

---

[76] Document No. 39, ex. Q.

[77] Id., ex. D at 367:25-368:5 ("Q. Are you familiar with any officer who had a single order from a supervising officer, where the officer chose not to comply with it because he thought it was unreasonable and the officer was not disciplined. A. No, sir."); id., ex. E at 61:4-9 ("Q. My question is very specific, and I'm asking you do you have any information that Lieutenant Merritt ever told Chief Fitzgerald that she would not comply with a direct order he gave her. A. Not that she specifically told him she was not going to comply with a direct order he gave her.").

Improvement Plan which expressly required him to "follow all lawful orders" and "not display pompous, argumentative, or disrespectful behavior to any citizen, fellow officer, or supervisor," and which informed Plaintiff that he would be terminated if he failed to comply with department policy.[78]   Plaintiff has presented no evidence that any other police officer serving under such a direct performance improvement mandate violated its material terms and was not terminated.

Plaintiff has not presented evidence sufficient to raise a genuine issue of material fact that "he was treated less favorably because of his [race] than were other similarly situated employees who were not [white], under nearly identical circumstances." Lee, 574 F.3d at 259.   Because Plaintiff has presented no evidence sufficient to establish a *prima facie* case of race discrimination under Title VII, Defendants are entitled to summary judgment.

### 3.   Texas Government Code Chapter 614, Subchapter B

Plaintiff and Defendants each move for summary judgement on whether Defendants violated Sections 614.022 and 614.023 of the Texas Government Code when Chief Fitzgerald fired Plaintiff.[79] These sections provide procedural protections for Texas law enforcement officers against whom complaints are lodged.

---

[78] Id., ex. N.

[79] Document No. 39 at 33-35; Document No. 40.

Essentially, the complaint must be in writing, signed by the complainant, and given to the officer, and the officer may not be terminated on the subject matter of the complaint without an investigation that yields evidence to prove the allegation of misconduct. *See* TEX. GOV'T CODE §§ 614.021-614.023. Plaintiff seeks a declaratory judgment that Defendants violated their statutory obligations under Section 614.022 by failing to provide to Plaintiff a written complaint before terminating him.[80] Defendants respond that Sections 614.022 and 614.023 do not apply to a situation like this where the decisionmaker, the Chief of Police himself, was the commanding officer whose direct order was disobeyed and where he therefore had full first-hand knowledge of the misconduct for which he terminated Plaintiff's employment.[81] Defendants further argue that Plaintiff later was given an adequate written complaint, that any violation of Section 614.022 and 614.023 was therefore remedied, and that regardless reinstatement is not an appropriate remedy.

The Texas courts appear not to have definitively resolved important questions on whether these procedural safeguards apply to *all* complaints, regardless of the source from which they emanate; whether a signed complaint is required in *all* circumstances where disciplinary action is taken against an officer; and what--if

---

[80] Document No. 10 ¶¶ 78, 80-82.

[81] Document No. 48 at 6-7.

anything--is the remedy if these statutory requirements are violated. *See, e.g.*, Treadway v. Holder, 309 S.W.3d 780, 784 (Tex. App.--Austin 2010) (holding 2-1 that a written complaint must be filed even by supervisors within the department complaining up the chain of command, with the dissenting justice foreseeing the issue that has arisen in this case and observing that "under the majority's construction, the agency head's own allegations could not even be 'considered' until he first wrote them down and signed the document."); City of Houston v. Wilburn, 01-12-00913-CV-2013, 2013 WL 3354182, at *4 (Tex. App.--Houston [1st Dist.] July 2, 2013) (avoiding the 'question of whether Chapter 614 requires a signed complaint in all circumstances resulting in disciplinary action against employees under its purview"); City of Athens v. MacAvoy, 353 S.W.3d 905, 909 (Tex. App.--Tyler 2011) ("Section 614.023 contains no specific consequence for noncompliance."); *but see* Guthery v. Taylor, 112 S.W.3d 715 (Tex. App.--Houston [14th Dist.] 2003) (ordering defendants to withdraw disciplinary action and restore back pay and benefits).

The procedural safeguards provided by these sections of Chapter 614 have broad application to many law enforcement officers of the State of Texas, firefighters, peace officers appointed or employed by political subdivisions of the State, detention officers, county jailers, and others, as well as to the departments that are their employers, and the legislation entails important

public policy.   Capable counsel on both sides of this case make strong opposing arguments as to how Sections 614.021 and 614.022 should correctly apply to the facts of this case.   In the absence of controlling state authority on how the statute applies in a case with facts like these, and finding that this claim raises novel and complex issues of state law that both Plaintiff and Defendants argue should be adjudged in their favor on summary judgment as a matter of law, and given that all federal claims over which the Court has original jurisdiction are dismissed with prejudice in this Memorandum and Order, the Court concludes that the important interests of federalism and comity will be well served by remanding this purely state law claim for determination by the courts of Texas.   Accordingly, the Court declines to exercise supplemental jurisdiction over this sole remaining state law claim.   *See* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if--(1) the claim raises a novel or complex issue of State law, [or] (3) the district court has dismissed all claims over which it has original jurisdiction"); Enochs v. Lampasas Cnty., 641 F.3d 155, 161 (5th Cir. 2011) ("Our general rule is to dismiss state claims when the federal claims to which they are pendent are dismissed.").

IV.  Order

For the foregoing reasons, it is

ORDERED that Defendants' Motion for Summary Judgment (Document No. 39) is GRANTED in part, and Plaintiff Peter J. Paske's federal and state claims for race discrimination and retaliation and retaliation in violation of the First Amendment are DISMISSED with prejudice, leaving only the motion on Plaintiff's Texas Government Code, Chapter 614, Subchapter B claim, which is remanded to state court.  It is further

ORDERED that Plaintiff's sole remaining claim, namely, his state law claim that Defendants' termination of Plaintiff's employment was in violation of Texas Government Code §§ 614.021-614.023, which is also the subject of his Motion for Partial Summary Judgment (Document No. 40), is SEVERED from this action and REMANDED to the 240th District Court of Fort Bend County, Texas. A separate Final Judgment will be entered for Defendants on all other claims.

The Clerk shall notify all parties and provide them with a true copy of this Order.

SIGNED at Houston, Texas, on this _7th_ day of April, 2014.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

35